RANDY S. GROSSMAN
Acting United States Attorney
ALEXANDRA F. FOSTER
Assistant United States Attorney
Washington, D.C. Bar No. 470096
United States Attorney's Office
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-6735

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | Case No. 19CR1895-BAS |
|---|---|---|
| Plaintiff, | ) | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| v. | ) | |
| YE SANG "IVY" WANG (2), | ) | Date: December 21, 2021 |
| Defendant. | ) | Time: 10:30 a.m. |
| | ) | Before: Hon. Cynthia Bashant |

COMES NOW the plaintiff, United States of America, by and through its counsel, Randy S. Grossman, Acting United States Attorney, and Alexandra F. Foster, Assistant United States Attorney, and hereby files its Sentencing Memorandum. The Government files the following Sentencing Memorandum to supplement the Pre-Sentence Report (PSR) and the Government's Sentencing Summary Chart, and address some of the statements that Defendant made in the PSR (Dkt. No. 125), and her Objections to the Pre-Sentence Report (Objections), which included an objection to the +2 for abuse of a position of trust and a request for minor role (Dkt. No. 128).

# I
# STATEMENT OF THE CASE

Defendant Ye Sang "Ivy" WANG is a naturalized U.S. citizen, originally from Shenyang, China. The Defendant enlisted in the U.S. Navy in 2005 at the age of 21, and became a U.S. citizen in 2007. She then sponsored her husband, co-defendant Shaohua "Eric" WANG, to become a U.S. citizen. By at least September 2016, Shaohua "Eric" WANG was selling export-controlled military equipment to China with the help of his wife, the Defendant. Even though the Defendant knew she was under investigation as early as October 2018 when she was interviewed by NCIS and HSI agents at the airport, she continued to provide military equipment to her husband through at least December 4, 2018, when agents searched her house.

The WANGs were indicted on May 22, 2019. They were arrested that same day and arraigned the following day. The Defendant was released on June 4, 2019, on a $250,000 personal surety bond.

On September 26, 2019, Shaohua "Eric" Wang pled guilty to an information charging him with Conspiracy To Export Defense Articles Without A License And Exporting Defense Articles To An Embargoed Country (18 USC Sec. 371; 22 USC Secs. 2778(b)(2) and (c); and 50 USC 1705 and 4819) and Money Laundering (18 USC Sec. 1956(a)(2)(A)). On February 3, 2020, this Court sentenced Shaohua "Eric" WANG to 46 months in custody with three years' Supervised Release on the Conspiracy count and 10 months in custody with three years' Supervised Release on the Money Laundering count, to run concurrent.  Shaohua "Eric" Wang is currently

serving the remainder of his sentence on home confinement at home with Defendant and their two minor children.

On July 20, 2021, the Defendant pled guilty to Conspiracy To Export Defense Articles Without A License (18 USC Sec. 371, and 50 USC Secs. 1705 and 4819), the first count of the Superseding Indictment. She suffered an Other Than Honorable discharge from the U.S. Navy in September 2021. A PSR was filed on November 16, 2021. This matter is set for sentencing on December 21, 2021.

## II
## STATEMENT OF FACTS

The Government will not repeat the information detailed in the Plea Agreement and the PSR. This sentencing memo serves solely to address some of the issues raised by the Defendant in the PSR and the Objections, specifically whether the Defendant's behavior warrants an uptick for abuse of trust and a downward departure for minor role.

Specifically, in the PSR, the Defendant asserted the following:

35. The defendant noted her home garage was full of items that "Eric" (S. WANG) told her he had purchased from thrift stores and intended to use for camping. The items were reportedly "piling up" and she asked him why he was purchasing so many items. S. WANG told her not to worry about it as it was "not [her] business." As she was extremely busy with her job and caring for their children, when he asked her if she could purchase some additional items for him, she did not think much of it.

36. Y. WANG told S. WANG not to ask her to purchase items for him as the orders needed to be military purchases. However, as S. WANG kept "bugging" her, Y. WANG provided him her email account. The defendant stated she told him "whatever you do it's up to you." Y. WANG was then deployed, and she

began to get nervous. Although they argued, S. WANG asked her to purchase an oxygen mask for his skydiving.

37. Upon returning from deployment, the defendant was interrogated for six hours about S. WANG's conduct. She noted she knew very little information, but he was reportedly selling outdoor gear and old military clothing. Y. WANG stated she told him she did not feel comfortable that he was selling military gear as she was enlisted in the U.S. Navy. She told him to stop, but he did not listen to her.

PSR at ¶¶ 35-37.

Similarly, in her Objections, the Defendant states, "[w]hile it is understandable that the Case Agent might conflate Ms. Wang's behavior with that of Mr. Wang or others who have committed similar crimes of even greater severity where exportation of ITAR controlled items do pose a potential risk of harm, Ms. Wang's [actions] fell far short of jeopardizing anyone's safety." Objections at 7-8. These attempts to distance herself from her husband and co-defendant's activities are not supported by the facts in the case. Quite the opposite. The Defendant was critical to the scheme. Without her position and buying power for the U.S. Navy, her husband would not have been selling export-controlled equipment on his on-line store.

### A. Defendant Abused Her Position of Trust in the U.S. Navy and Did Not Play a Minor Role in the Business.

*The Defendant Was Buying Export-Controlled Military Equipment For Her Husband Off A Lengthy Excel Spreadsheet.*

At some point during this conspiracy, Shaohua "Eric" Wang emailed an Excel spreadsheet to the Defendant listing military equipment, including export-controlled military equipment (the Excel Spreadsheet). Shaohua "Eric" Wang gave the

Defendant the Excel Spreadsheet for her to buy items from that spreadsheet and provide them to him, so he could sell them. At the time that the Defendant was purchasing military equipment for Shaohua "Eric" Wang, including items on the Excel Spreadsheet, she knew that he was selling military equipment to Chinese buyers. She told the agents as much when she was interviewed in October 2018.

For example, from December 2017 through January 2018, the Defendant sent emails from her military email address to the Tactical Night Vision Company (TNVC) requesting quotes for military equipment, which were on the Excel Spreadsheet.[1] Specifically, she sought to purchase CORE Survival HEL-STAR 6 Multi Function Marker Light, and the CORE Survival HEL-STAR 5 Three Function Marker Light from TNVC.[2] OpsCore XP FAST high-cut helmets are also on the Excel Spreadsheet, as is the Program Interface Module-701 (PIM-701). These items are all export controlled. As discussed in greater detail below, these items matter, because Shaohua "Eric" Wang could only gain access to them through the Defendant.

//

//

---

[1] In her Objections, the Defendant notes that an NCIS report identified Eric Wang as purchasing the export-controlled items from TNVC. That is incorrect. The report first identified the Defendant as S/WANG at the top of page 1, and then explained the TNVC purchase as follows: "Additionally, on 04Jan18, S/WANG purchased several export controlled items from TNVC Inc., to include three items which are [on the] United States Munitions List (USML)…."

[2] These lights only work in conjunction with the Program Interface Module-701 (PIM-701), identified on the plea agreement and discussed in further detail below.

*The Defendant Was Involved In Procuring The Export-Controlled Plates And Helmets, Which Her Husband Kept In Their Garage And Sold On His Chinese On-Line Store.*

Throughout 2018, Shaohua "Eric" Wang sent potential Chinese customers photographs of military equipment, such as uniforms, ballistic plates and ballistic helmets, belonging to the United States Department of Defense. These were the photographs taken within the confines of Defendant's command, including the photographs with a handwritten sign or a mark containing the name "60 Freeway." Shaohua "Eric" Wang held out this equipment as available for sale from his on-line Taobao store, "60 Freeway." (Taobao is a Chinese online shopping platform owned and run by AliBaba and facilitating consumer-to-consumer sales.)

In her Objections, Defendant asserts that Shaohua "Eric" Wang –and not the Defendant—took the pictures that he then posted. This assertion means that the Defendant granted Shaohua "Eric" Wang access to a secure and restricted storage area on the Navy base, so that he could take pictures of Naval Special Warfare gear for his sales to China. This assertion does nothing to minimize the Defendant's culpability.

In November 2018, a coconspirator in China confirmed receipt of an OpsCore XP FAST high-cut helmet, which was on the Excel Spreadsheet, is subject to export controls, and requires a license for export to China. The helmet was sent by Shaohua "Eric" Wang, who directed the coconspirator to list the ballistic helmet, for sale for $16,000 RMB, approximately, $2,300. The Department of Defense confirmed that

this particular helmet's serial number (visible in the picture that Eric sent to his coconspirator in China) traces back to Naval Special Warfare, SEAL Team-5. Defendant had ready access to SEAL Team-5's supplies.

Also, in November 2018, Shaohua "Eric" Wang exchanged messages and pictures with a coconspirator in China, who had received ballistic plates shipped by Shaohua "Eric" Wang. The two discussed the types and pricing of the ballistic plates in China. These plates required a license for export, and at least some of these plates were stolen from the United States Department of Defense. Specifically, the serial numbers on two of the plates trace back to Defendant's command and the serial number on a third plate traces back to Naval Special Warfare, Logistical Support Unit 1 (LSU-1). Defendant had ready access to her command's supplies and to LSU-1's supplies.

On December 4, 2018, when executing a search warrant at the WANGs' house, law enforcement found four OpsCore XP high-cut helmet, which were subject to export controls. The Department of Defense confirmed that three of these helmets' serial numbers traced back to the Defendant's command, and one traced back to Naval Special Warfare, Explosive Ordnance Disposal Twelve (EOD-12). Defendant had ready access to EOD-12's supplies. Two of the helmets were found in the WANGs' garage, and the other two were found in the Defendant's car.

//

//

*The Defendant Forwarded Information To Her Husband Concerning A Sky Diving Mask, Which She Knew Was Export-Controlled.*

On or about January 16, 2018, a Chinese customer asked Shaohua "Eric" Wang for information on a hazardous-material oxygen system, which was subject to export-control regulations and required a license for export to China. Soon thereafter, the Defendant reached out to the company, which sold this system, to request a quote for purchasing it. Once the Defendant received the quote, which included details clearly identified as export-controlled information, she forwarded the quote and the export-controlled information to Shaohua "Eric" Wang.

*The Defendant Concedes That She Should Have Known This Military Equipment Was Export Controlled.*

In her plea agreement, the Defendant concedes that, as a U.S. Navy employee for 14 years and a Logistics Specialist for four, she had undergone multiple rounds of training on the handling of export-controlled military equipment and the prohibition on shipping such equipment to specific countries, including China. She further conceded that the military-equipment companies' websites and emails that she received from the companies for the military equipment that she sought to purchase-- both for legitimate U.S. Navy purchases and for the illegal purchases for Shaohua "Eric" Wang-- often included banners that explained that the equipment was export-

controlled.[3] Third, Shaohua "Eric" Wang told the Defendant that he could not buy export-controlled military equipment using his personal email address, which is why he asked her to do so for him, using her position in the U.S. Navy and her military email address. There is no doubt but that, at best, Defendant was aware of a high probability that the items she was purchasing for her husband were export controlled, and she deliberately avoided learning the truth. 9th Cir. Crim. Jury Instr. 5.8 (Deliberate Ignorance).

*The Defendant Attempted To Cover Her Tracks.*

<u>Doctoring Invoices</u>. On or about January 5, 2018, the Defendant received an invoice from TNVC with a "PAID" stamp at the top, dated January 4, 2018. On January 28, 2018, the Defendant left a voice message for Shaohua "Eric" Wang, instructing him to change the January 5, 2018 TNVC invoice to ensure that shipment of this military equipment could make it through Chinese customs. She told him, in Mandarin, "You better change my name on 'ship to.'" She also added, "I drew out all places that needed to be changed. Change according to what I drew."

---

[3] Contrary to her assertion otherwise in her Objections (p.8), the Defendant also concedes in her Plea Agreement that the company that sold her the PIM-701 had the following banner on its website:
> ITAR: All HEL-STAR models with IR operating modes are ITAR controlled and cannot be shipped or carried outside the United States without express written permission from the United States Department of State. Export is strictly prohibited without a valid export license issued by the U.S Department of State Office of Defense Trade Controls (DDTC) as required by the International Traffic In Arms Regulation (ITAR). Title 22, Code of the Federal Regulation (CFR) Parts 120-130.

Docket No. 113, at p. 5, fn.1.

On the same day, the Defendant emailed a marked-up TNVC invoice to Shaohua "Eric" Wang. In it, her name was crossed out and replaced with "Celine Terry" on the "ship to:" line. The TNVC header, website and email address were also crossed out and replaced with "GSA Auction," "www.gsa.gov" and "sales@gsa.gov." That same invoice contains the ITAR warnings, noting that export licenses are required, in the lower left-hand corner.

<u>Hiding Plates and Helmets at Her Home</u>. On or about March 27, 2018, while the investigation was ongoing, a U. S. Navy work colleague told Defendant that she was "in big trouble." Defendant was deployed. She believed her "big trouble" was in reference to her criminal export activity with her husband, so she texted Shaohua "Eric" Wang, "There will be more trouble when that stuff stays longer over there. You know? Process quickly. It may be trouble if it stays for a day and someone opens it." After further texts on or about March 27, 2018, and March 28, 2018, Shaohua "Eric" Wang texted Defendant, "In other words, take helmets and plates. What else? Only helmets and plates are sensitive, there isn't anything else." Defendant responded, "Correct. It's nothing. In other words … just hide these things."

**B. The Program Interface Module, Which The Defendant purchased, is available only to the military, and has different and much greater capacity than its civilian counterpart.**

According to CORE Survival Inc., which sells the Program Interface Module (PIM), there are two versions of the PIM, one civilian and the other military (at times identified as tactical). The PIM-701 is the military/tactical version and export is

controlled by the U.S. Department of Commerce. The Defendant bought and had shipped the PIM-701. CORE Survival does not sell the PIM-701 to civilians. The PIM 701 has InfraRed technology, for soldiers to identify friend from foe in the dark, and at great distances (like from airplanes or drones).

The civilian version (PIM-702) is meant for identifying people within the user's line of sight in daytime – there is no InfraRed, and information is not relayed at great distances. There is no practical use for either PIM in a camping environment.

HEL-STARs with InfraRed --which are the export-controlled lights on soldiers' helmets-- can be seen in the dark with night vision devices on the PIM-701.[4] The PIM-701 can be used to reprogram the functions of a programmable HEL-STAR with InfraRed to flash patterns and colors that are different from its civilian counterpart. The PIM-701 will only work with a programmable HEL-STAR with InfraRed.

Conversely, the civilian version of the HEL-STAR strobe does not have InfraRed. It only has visible colors of Blue, Green, Red and White. The civilian PIM (PIM-702)[5] will only program visible colors on a programmable, non-InfraRed HEL-

---

[4] As noted earlier in this memo, these export-controlled lights were on the Excel spreadsheet. The Defendant sought to purchase them from TNVC for her husband in December 2017-January 2018, a few months before she bought the PIM-701.

[5] In Exhibit B of the Objections, the purchaser is buying the civilian version, a PIM-702, as identified at the top of page 2. In Exhibit D of the Objections, Mr. Blair apparently sought to purchase a PIM-701. Once the purchase is made, the seller follows up with the buyer to confirm the buyer's status before shipping the PIM-701 to the buyer.

STAR. The PIM-702 (civilian) will only work with a programmable non-InfraRed (civilian) HEL-STAR.

PIMs are clearly marked with a part number and description of "tactical" for PIM-701 and "civilian" for PIM-702. The customer is also vetted by the company prior to shipment. The company cannot ship the PIM-701 to civilian users.

If the PIM-701 ended up in the wrong hands, the enemy could use the PIM-701 to program a device to imitate the same functions as U.S. forces on the battlefield, which would allow an enemy to blend in with U.S. troops in the dark. An enemy could also study the PIM-701 in order to make another device that mimics equipment used by U.S. forces, and cause soldiers to confuse friend with foe on the battlefield.

### C. Defendant Has Expressed Little Remorse For Her Involvement in Selling Export-Controlled Military Equipment to China.

Given her 14 years in the U.S. Navy, her knowledge of her husband's history as an officer in the People's Liberation Army, and her understanding that her husband's business involved shipping military equipment to China, the Defendant no doubt understood the importance of export controls on military equipment, and the very real consequences of giving items, such as devices which can identify U.S. military personnel in the field, to her husband. She nonetheless had no qualms purchasing military equipment using her position in the U.S. Navy, and handing it over to him for sale to Chinese buyers.

The Defendant expressed no remorse at the time the agents interviewed her in October 2018, and there is little indication of remorse in the PSR. She noted solely

that she felt "awful" about her conduct, and that she "should have known better," but it appears that she is upset, not because export-controlled military equipment ended up in the wrong hands, but because she was fired and no longer has a job with the U.S. Navy. *See* PSR at ¶ 39.

That attitude is reflected in her Objections. Compounding her statements in the PSR, Defendant counters the case agent's assertion that the Defendant betrayed her oath to the U.S. Navy and put the lives and safety of fellow U.S. service members at risk with: "This characterization of Ms. Wang's conduct is hyperbolic at best, and categorically false at worst. No U.S. service members were endangered by Ms. Wang's conduct." Objections at 6. As detailed above for the PIM-701, all of the export-controlled gear --from the PIM-701 and HEL STAR lights to the ballistic helmets and plates-- and the information --from information about high-altitude/low opening oxygen technology to access to the Naval Special Warfare equipment storage room-- which the Defendant provided to her husband could be exploited by the United States' adversaries. The fact that Defendant refuses to acknowledge as much is a clear indication that she has taken very little responsibility for her actions.

## III
## PRESENTENCE REPORT

In this matter, the PSR writer calculated a base offense level of 26, with a +2 adjustment for abuse of trust, which adds up to an adjusted offense level of 28. The writer then subtracted three points for acceptance of responsibility, resulting in an adjusted total offense level of 25. The PSR writer found that Defendant was in

Criminal History Category I, resulting in a guideline range of 57 to 60 months.[6] The writer considered 18 U.S.C § 3553(a) factors and ultimately recommended a sentence of 30 months in custody with three years' supervised release to follow. The PSR writer also recommended a $100 special assessment and a $20,000 fine.

## IV
## GOVERNMENT'S POSITION ON SENTENCING

In the wake of *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing Guidelines are advisory, to be considered in conjunction with the factors set forth in 18 U.S.C. § 3553(a) in imposing a sentence. The Government's calculations align with the PSR writer, making the Defendant's Guidelines range 57 to 71 months. The Plea Agreement recognizes the Defendant's integral involvement in her husband's business, selling export-controlled military equipment, and her position of trust as a Logistics Specialist, who wielded significant power and discretion in ordering export-controlled military equipment for the U.S. Navy. The Plea Agreement also includes credit for acceptance of responsibility. Taking into consideration the Guidelines, her Other Than Honorable discharge from the U.S. Navy, her status as the mother of two children under 10, and Shaohua "Eric" Wang's sentence of 46 months, and consistent with the Plea Agreement, a sentence of 33 months is warranted.

//

//

---

[6] The Sentencing Summary Chart on the PSR reads 57 to 60 months, but the appropriate range for CHC I, AOL 25 is 57 to 71 months.

# V
# CONCLUSION

Consistent with the plea agreement, the Government respectfully requests that the Court sentence Defendant to 33 months in custody, three years' supervised release, a $100 special assessment and no fine.

DATED:  December 14, 2021                Respectfully submitted,

                                                                     RANDY S. GROSSMAN
                                                                     Acting United States Attorney

                                                                      *Alexandra F. Foster*
                                                                   ALEXANDRA F. FOSTER
                                                                   Assistant United States Attorney